**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

JULI KELLER,

    Plaintiff,

vs                                                                  No. CIV. 98-1147 MV/RLP

**KENNETH S. APFEL,
Commissioner of Social
Security Administration,**

    Defendant.

## MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION[1]

1. This matter comes before the Court on the Motion of Juli Keller ("Plaintiff") to Reverse the decision of the Commissioner of Social Security denying her application for Disability Income Benefits (DIB) and Supplemental Security Income benefits (SSI) (Docket No. 9). Plaintiff seeks reversal with instructions to award benefits, or in the alternative, reversal and remand with instructions to conduct additional proceedings.

**I.**     **Administrative History**

2. Plaintiff originally applied for DIB and SSI benefits in July 1992. (Tr. 52). Those applications were denied on February 4, 1993. (Tr. 52-53). Plaintiff did not appeal either denial.

3. Plaintiff again applied for DIB and SSI on May 20, 1994. (Tr. 55-62). Her claims were denied initially and on reconsideration. (Tr.72-75, 79-84). Plaintiff appeared at a hearing before an administrative law judge (ALJ) on December 14, 1995. (Tr. 31-50). On March 24, 1996, the ALJ

---

[1] Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. §636(b)(1), file written objections to such proposed findings and recommendations. A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

found that Plaintiff had the residual functional capacity to perform her past jobs as a cashier, photocopy operator, deli cook and day care teacher, and was therefore not disabled. (Tr. 10-22). The ALJ specifically stated that he had applied *res judicata* to the period covered by Plaintiff's prior applications, that is, to the period prior to February 4, 1993. The Appeals Council declined to review Plaintiff's claim on July 31, 1998. (Tr. 4-5).

4. This Court has no jurisdiction to review the Commissioner's refusal to reopen a claim for disability benefits or a determination that such claim is barred by *res judicata*. **Califano v. Sanders**, 430 U.S. 99, 107-09, 97 S.Ct. 980, 985-86, 51 L.Ed.2d 192 (1977); **Krumpelman v. Heckler**, 767 F.2d 586, 588 (9th Cir.1985), *cert. denied*, 475 U.S. 1025, 106 S.Ct. 1222, 89 L.Ed.2d 332 (1986). The Commissioner's decision not to reopen a previously adjudicated claim for benefits is discretionary and, therefore, is not a final decision reviewable under §42 U.S.C. 405(g). **Krumpelman**, 767 F.2d at 588.May 20, 1994. (Tr. 55-58, 59-62). Accordingly, the Court will consider evidence of Plaintiff's impairment as of February 4, 1993, through the date of the ALJ's decision, March 24, 1996.

## II. Summary of the Facts

5. Plaintiff was born on October 29, 1954. (Tr. 55). She did not graduate from high school. (Tr. 34-35). She has had asthma since 1972. (Tr. 100). She was previously employed as a day care teacher (1978-1986), photocopier (1987), cashier/attendant at a gas station (10/87-1/89), part-time cook and cashier (1992) and substitute homemaker (6/94-2/95 and 9/95-11/3/95). (Tr. 415). The ALJ "giving the Plaintiff the benefit of the doubt," determined that her work in 1994 and 1995 did not constitute substantial gainful activity. (Tr. 14).

6. Plaintiff's medical history is extensive and complex. The following is a summary relevant to

this opinion.

    **A.**    **1993**

Mental condition

7. Plaintiff started taking a prescription antidepressant on August 12, 1993, following a diagnosis of anxiety. On December 20 a consulting psychiatrist diagnosed her mental problem as unresolved grief stemming from the death of her son in an automobile accident and alcoholism in partial remission. (Tr. 257, 254).

Pulmonary condition

8. In December 1993, Plaintiff was seen on three occasions for asthma, or complications stemming from asthma. On December 7, she complained of pain in the back of her chest. Physical examination disclosed coarse inspiratory rhonchi, expiratory wheezes and palpable tenderness in the left anterior chest wall. She was treated for bronchitis was with antibiotics (Bactrim), Tylenol #3[2] for pain, and her normal asthma medications. (Tr. 255). Two weeks later her condition had improved, although she still had expiratory wheezing and mild anterior chest wall and axillary tenderness. Her prescription for Tylenol #3 was renewed. (Tr. 253). On December 29, Plaintiff was seen in the emergency room for an exacerbation of asthma secondary to pleuritis. She was treated with nebulizers (Albuterol), steroids (Prednisone) and Toradol[3] (Tr. 251-252), and her antibiotic was changed to Erythromycin. (Tr. 267).

---

[2]Tylenol #3 contains Codeine, and is indicated for the relief of mild to moderately severe pain. *1998 Physicians' Desk Reference* at 2061-2063.

[3]Toradol is a nonsteroidal anti-inflammatory drug indicated for the short term (up to 5 days) management of moderately severe actue pain that requires analgesia at the opioid level. **Id.** , at 2507.

3

**B.     1994**

Pulmonary condition

9.     Plaintiff returned to the emergency room on January 4, 1994, complaining of lower rib pain, cough, nausea and vomiting, and shortness of breath. She was subsequently admitted as an inpatient for three days in order to treat an exacerbation of asthma with bronchitis that had not responded to outpatient antibiotic therapy. She was treated with nebulizers, steroids and an antibiotic (Unasyn). (Tr. 262-281). She returned to the hospital on January 13 for a follow up visit. On physical examination she demonstrated occasional end expiratory wheezes, without dullness or rhonchi. Her nebulizer treatments were decreased in strength. (Tr. 332). Ms. Keller returned for a second follow up visit on February 11. At that time she had mild left anterior chest wall tenderness and her lungs were clear to auscultation. Chest x-ray taken that day disclosed focal linear atelectasis not present before, with continued interstitial prominence and a small granuloma in the right apex. Her pleurisy and costochondritis (an inflammation of the cartilage around the ribs) were assessed as resolving, and she was placed on a trial of Flexeril.[4]  (Tr. 326, 343).

10.     Plaintiff was seen in the emergency room on February 27, 1994, with numerous complaints. She stated that she had not been using her nebulizer at home, and was given nebulizer treatment, an antibiotic, Tylenol, steroids, and Albuterol per inhaler. The final assessment indicated that she suffered a viral upper respiratory infection and "RAD-mild."  (Tr. 324-325). On follow up examination two days later she had scattered end expiratory wheezes. She was advised to return in two weeks for additional follow up. (Tr. 327). She returned after one week, complaining of pain in

---

[4]Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm assoicated with acute, painful musculoskeletal conditions. *Id.* at 1656.

her chest wall on coughing, and her chest wall was tender on examination. She indicated that she was leaving town for 3-4 weeks to camp in Colorado, and requested a different asthma inhaler, stated that she had run out of medications one week earlier. She was given a different inhaler (Baclovent), an additional prescription for steroids and a prescription for Robaxin[5]

11. Plaintiff was next treated for respiratory complaints on June 2, 1994, complaining of increased asthma and symptoms of pleuritis. On exam, she had diffuse expiratory wheezes, swollen nasal passages and a green discharge from her sinuses. (Tr. 312-13).

12. She returned to the emergency room on July 6 complaining of sore throat and shortness of breath. She had spent the prior weekend in the mountains with friends, and had not utilized her nebulizer. On examination, her tonsils were swollen, her lungs showed inspiratory and expiratory wheezes and her rib cage was tender. An upper respiratory infection was diagnosed, and she was placed on an antibiotic (Keflex) and Percocet.[6] (Tr. 309-309). At a follow up visit eight days later her condition was diagnosed as viral bronchitis and pleuritis. She was advised to complete her antibiotics, and given Roxicet for control of cough and pleuritic chest pain and prescription cough medication (Tessalon). (Tr. 307, 393).

13. Plaintiff's asthma was exacerbated on September 12, 1994, by another upper respiratory infection. She was treated as an outpatient with medication. (Tr. 306).

14. Plaintiff returned to the hospital on October 24, 1994, complaining of a worsening chronic cough. She stated that she did not feel she needed nebulizer treatment or steroid therapy, and was

---

[5]Robaxin is indicated as an adjunct to rest, physical therapy and other measures for the relief of discomfort associated with acute, painful musculoskeletal conditions. *Id.* at 2428.

[6]Percocet is an analgesic and sedative, indicated for the relief of moderate to moderately severe pain. *Id. at 914-915.*

released with a prescription for an antibiotic and instructions to increase the use of her Ventolin inhaler. (Tr. 301).

15. Plaintiff was seen in the emergency room on November 20, 1994, with complaints of shortness of breath, sore throat, and hemoptysis. A chest x-ray taken to rule out infiltrates found no acute thoracic disease or interval change. The hempotysis was attributed to the use of nonsteroidal anti-inflammatory medication. She was treated with an antibiotic (Penicillin), steroids, home nebulizer and bronchodiators treatments and cough syrup for a viral respiratory infection and exacerbation of asthma. (Tr. 296-297, 344). Her asthma had improved at follow up visits on November 23 and November 30. (Tr. 295, 294).

16. Pulmonary function studies conducted on December 6, 1994, demonstrated a moderate obstructive ventilatory defect not improved by inhaled brocholilator, normal diffusing capacity and flow volume loop consistent with obstructive disease. (Tr. 391-392).

17. Plaintiff was seen as an outpatient on December 12, 1994, with complaints of a dull pain in her back, moving toward the front. On examination, she had a productive cough, but was unable to clear her lungs by coughing due pain and tenderness in the area of her mid back. Her lungs were "wheezy" but did not demonstrate pleural rub or rales. She was treated with an antibiotic (erythromycin) and Tylox[7] for pleuritic chest pain. (Tr. 293). At follow up examination eight days later, her right thorax remained tender to palpation, and costochondritis was diagnosed. She was advised to take Ibuprofen. (Tr. 292), She was seen again the following day with continued complaints of chest pain. She was then referred to the pulmonary clinic, and provided with a

---

[7]Tylox is a synthetic narcotic analgesic indicated for the relief of moderate to moderately severe pain. *Id.* at 2063.

prescription for Tylox. (Tr. 291).

### Headache

18.     During Plaintiff's hospitalization of January 5-7, 1994, she complained of an intense headache with photophobia and dizziness. Migraine headache was diagnosed after CT scan ruled out hemorrhage and meningitis. (Tr. 262, 266-268, 344). She was treated with Midrin[8] after Imitrex[9] and Demerol[10] failed to control headache pain. (Tr. 264). She returned to the hospital on January 13 for a follow up visit, complaining of continued headache. Midrin was discontinued, and she was given a few Codeine tablets, after a discussion regarding multiple narcotic use. (Tr. 332). 19.

On July 6, 1994, Plaintiff was seen in the emergency room for pulmonary problems. She complained at that time of headache, and migraine headache was included in her differential diagnosis. (Tr. 308-309). Her complaints of headache had continued as of a follow up visit on July 14. (Tr. 307).

20.     In August and September 1994 Plaintiff was seen by Dr. H.C. Zenger, an orthopedic surgeon, for musculoskeletal injuries. During that time, she complained of headache. (Tr. 360, 358, 356). As of September 7, Dr. Zenger noted that Midrin seemed to be relieving her headache easily. (Tr. 357).

### Work Injury

21.     Plaintiff strained her right shoulder and sprained her right ankle on August 8, 1994, while working for the Association of Retarded Citizens. (Tr. 356, 362-364). She was treated for

---

[8] Midrin is indicated for the relief of tension and vascular headaches, and has been classed as "possibly" effective in the treatment of migraine headaches. *Id.* at 825-826.

[9] Imitrex is indicated for the acute treatment of migraine headaches. *Id.* at 1037.

[10] Demerol is a narcotic analgesic indicated for relief of moderate to severe pain. *Id.* at 2570-72.

7

approximately one month for these injuries by Dr. Zenger. Although initially off work due to the injuries (Tr. 364), she was returned to light duty on August 22, August 31 and again on September 7. (Tr. 283, 287, 357-365). By September 12, 1994 she had full range of motion of her shoulder with minimal pain. Her physicians at UNMH indicated that if she had a problem obtaining clearance to work, she could obtain a second opinion from the family practice or occupational medicine departments at UNMH. (Tr. 304).

### C.     1995

Pulmonary condition

22.     Plaintiff was evaluated at the Pulmonary Clinic at UNMH on January 18, 1995. Her exam was normal except for expiratory wheezes in all lung fields. The physician indicated that her asthma was impacted by chronic exposure to tobacco and inadequate control of inflammation. Her prescriptions for asthma medication were reviewed and renewed, she was counseled to stop smoking and to avoid smokers, given a prescription for Percocet for pain and referred to the pain clinic. (Tr. 383). At her administrative hearing, Plaintiff testified that she had reduced her smoking and that whenever she did pick up a cigarette, inhaling caused her to cough. (Tr. 49).

23.     Plaintiff returned to UNMH on February 9, 1995, to obtain prescription refills. She stated at that she was using Percocet five times daily, and wanted to stop its usage. She was given a prescription for Tylox. (Tr. 380). She was seen in the emergency room on February 20, with complaints of pain and a productive cough. She was assessed as suffering from chronic pain and pleurisy, and given a prescription for additional Tylox. (Tr. 378-379). Her increasing use of narcotic pain medication was commented on in a February 23 chart entry, and her need to be seen at the pain clinic was again noted. (Tr. 377).

24.     Plaintiff was evaluated at the pain clinic on March 14, 1995. Her primary complaints were a ten year history of rib pain increasing with inspiration and cough, and chronic use of Tylox. Her pain was considered to be structural, related to costrochondritis, rather than neuropathic in origin. Treatment with nerve blocks to control pain was ruled out and she was advised to continue tapering her use of pain medication, return to her primary care doctor, and consider psychological counseling. (Tr. 374-374, 381). She returned to her primary care doctor on March 16, having decreased her use of Tylox to three per day. She complained that her asthma was exacerbated by cats at her workplace, and was given a work excuse indicating the need to work in a pet-free environment. (Tr. 373).

25.     On May 15, 1995, Plaintiff obtained prescription renewals, including one for Roxicet. (Tr. 407). By May 19 she complained of increased sinus symptoms, nasal discharge, productive cough and wheezing. Asthma and bronchitis was diagnosed, and she was given cough and additional asthma medication. (Tr. 406).

26.     Plaintiff returned to the hospital on July 7, 1995, complaining of a four day history of sore throat and inability to sleep. On physical examination she had prolonged expiratory wheezing and swollen eye lids. An upper respiratory tract infection was diagnosed. Her sleep problems were thought secondary to the time of day at which she took her antidepressant. (Tr. 402). She returned to the outpatient clinic on July 12, complaining of continued sleep disturbance and hoarseness. Her nose was congested, her neck was tender and she had pharangeal inflammation. Viral pharangitis, bronchitis and insomnia were diagnosed, and she was placed on an antibiotic (Bactrim) and given prescription for additional Roxicet. (Tr. 401). As of July 27, her asthma was considered stable, with no shortness of breath an only mild inspiratory and expiratory wheezing.

27.     On October 27, 1995, Plaintiff suffered another exacerbation of asthma caused by bronchitis.

On physical examination, she had audible wheezing, inflamed mucosa, and mild swelling of her throat. She was placed on an antibiotic (Bactrim) and cough medicine. (Tr. 396). She continued to complain of cough and right sided chest pain at her follow up examination on November 2, and was given Percocet and cough medication. (395). On November 15, 1995, Plaintiff's treating physician, Dr. Winston corroborated the connection between Plaintiff's pulmonary condition and complaints of pain, stating:

> Ms. Keller has had severe obstructive lung disease (asthma) for many years which is only partially improved with treatment. . . The lung disease creates several problems, including recurrent bronchitis, and severe pleuritic and muscular chest pain from frequent infections and coughing.

(Tr. 393).

Work injury

28. Plaintiff suffered mild cervical and back strain while working for the Association of Retarded Citizens on January 20, 1995. (Tr. 354). She was treated for this by Dr. R.M.Battle, who released her to modified duty, with lifting limited to 25 pounds, given a prescription for Skelexin to treat muscle spasm and urged to use Tylenol ES rather than Tylenol #3 for pain, as the latter could decrease her cough reflex. (Tr. 354-355). As of January 27, she had no palpable spasm in the cervicothoracic area and full range of neck motion, and was released to regular duties. (Tr. 353). When last seen by Dr. Battle, she stated she felt a lot better, had full range of neck motion and no palpable spasm of the thorax. (Tr. 352).

29. Plaintiff testified that her pain required her to change positions frequently, and that no position relieved her pain. She also stated that her physicians were attempting to wean her from narcotic pain medication, and that as of her administrative hearing, she used two Percocet per day, which did not control her pain. (Tr. 43)

### Headache

30. When evaluated for cervical and back strain on January 20, 1995, Plaintiff complained of a history of migraine headaches. (Tr. 354). On January 27, she complained of a headache of three days duration, causing emesis. (Tr. 353).

### Mental condition

31. Plaintiff was assessed as suffering from moderate depression with poor sleep pattern at the time of her evaluation at the pain clinic on March 14, 1995. The clinician advised her to increase her use of Elavil, and to consider psychological counseling. (Tr. 381). On March 16, her primary care physician indicated that Ms. Keller felt better in terms of depression, with decreased mood swings. Her antidepressant was changed to Zoloft, and she was taken off of Elavil. (Tr. 373).

32. A psychological evaluation was conducted on March 30 at the request of the Department of Vocational Rehabilitation. Plaintiff complained of an inability to concentrate, day-dreaming, insomnia, an inability to perform fast paced work, depression, and stated that she could work only four hours per day due to her energy levels. The evaluator, Catherine MacLean, PhD, indicated that Plaintiff's history was consistant with depressive disorder NOS with mixed dysthymic features and unresolved grief, with psychological factors (personality traits/coping style and stress related symptoms) affecting a physical condition. Dr. MacLean also indicated that Ms. Keller needed psychological therapy. (Tr. 366-370).

33. On July 2, 1995, Plaintiff was placed on Trazadone, an antidepressant (Tr. 400), for sleep problems and depression (Tr. 393). Prozac, another antidepressant was added on August 17. (Tr. 399). Plaintiff testified that this combination of medications helped her to sleep, and appeared to be working. (Tr. 47-48).

Immune Deficiency

34. On August 18, 1995, Dr. Winston, noted that Plaintiff was seeing Leah Thorsen, M.D., a psychiatrist. Dr. Winston's note indicates that Dr. Thorsen had suggested the possibility of immune deficiency syndrome. None of Dr. Thorsen's notes are in the file. Dr. Winston ordered liver function tests. (Tr. 399). Plaintiff's liver function and "RF" (rheumatoid factor) tests were elevated. She was advised to stop taking niacin supplements and mushroom tea, and referred for a rheumatology consult. (Tr. 397). Dr. Wilson further indicated that the rheumatology consult was in the hospital chart (Id.), but it is not a part of the administrative record. In a letter dated November 15, 1995, Dr. Wilson indicated that although Plaintiff did not demonstrate normal symptoms, she had tested positive for rheumatoid arthritis which required further evaluation and that in the doctor's opinion, Ms. Keller had an autoimmune problem. (Id.). Symptoms which Dr. Winston considered to be presesnt were not listed (Tr. 393), however, Plaintiff testified to stiffening and deformities of her hands and joint pain. (Tr. 42).

**D.    1996**

Hepatic disease

35. In a letter dated January 8, 1996, and submitted to the Appeals Council, Dr. Wilson stated that Plaintiff had recently been diagnosed with Hepatitis C, which could not be transmitted through casual contact. (Tr. 417) Liver biopsy performed on February 16 was consistent with chronic hepatitis type C, with portal inflammation, piecemeal necrosis, lobular inflammation and fibrosis. (Tr. 421).

**III.    Standard of Review**

36. The Commissioner's disability determinations are reviewed to determine (1) if the correct

legal principles have been followed,[11] and (2) if the decision is supported by substantial evidence.[12] *See* 42 U.S.C. § 405(b); ***Bernal v. Bowen***, 851 F.2d 297, 299 (10th Cir. 1988); ***Williams v. Bowen***, 844 F.2d 748, 750 (10th Cir. 1988). In this review, this court must "meticulously examine the record and review it in its entirety." *Id*. Evidence is not substantial "if it is overwhelmed by other evidence - particularly certain types of evidence (e.g., that offered by treating physicians) or if it really constitutes not evidence but mere conclusion." ***Kent v. Schweiker***, 710 F.2d 110, 114 (3rd Cir. 1983), *cited in* ***Knipe v. Heckler***, 755 F.2d 141, 145 (10th Cir. 1985).

**IV.    Issues Raised**

37.    Plaintiff contends that the ALJ committed two errors.

- The ALJ erred in failing set forth the reason for his finding that Plaintiff did not meet or equal a listed impairment. Plaintiff further states that had the ALJ properly analyzed and reviewed the record, he would have found that Plaintiff' impairment of asthma meets the criteria of *per se* disability under 20 C.F.R. Pt. 404, Subpt. P, App. 1, §3.03B;

- The ALJ improperly evaluated Plaintiff's subjective complaints of pain by failing to

---

[11]The Commissioner's decision will be reversed when he uses the wrong legal standards or fails to clearly demonstrate reliance on the correct legal standards. ***Glass v. Shalala***, 43 F.3d 1392, 1395 (10th Cir. 1994).

[12]"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Castellano v. Secretary of H.H.S.***, 26 F.3d 1027, 1028 (10th Cir. 1994). "The finding of the (Commissioner) as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Substantial evidence is more than a scintilla but less than a preponderance. ***Richardson v. Perales***, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). Evidence is not substantial if it is overwhelmed by other evidence of record. ***Williams v. Bowen***, 844 F.2d 748, 750 (10th Cir. 1988). In determining whether substantial evidence exists, the Court does not review the issues *de novo*, ***Sisco v. Dept. of H.H.S.***, 10 F.3d 739, 741 (10th Cir. 1993), reweigh the evidence or substitute its judgment for that of the Commissioner. ***Glass v. Shalala***, 43 F.3d 1392, 1395 (10th Cir. 1994). The Court's review will, however, involve a meticulous examination of the entire record. ***Williams***, 844 F.2d at 750.

consider all factors relevant to whether Plaintiff's pain was disabling, and by distorting the record.

*Plaintiff's Memorandum in Support of Plaintiff's Motion to Reverse or Remand Administrative Agency Decision* (Docket No.10 at p.20-24).

## V. Analysis

### A. The Plaintiff does not meet the criteria for disabled under 20 C.F.R. Pt. 404, Subpt. P, App. 1 §3.03B.

38. Plaintiff contends that the medical records establish that her asthma condition meets criteria of *per se* disability found in 20 C.F.R. Pt. 404, Subpt. P, App. 1 §3.03B. Plaintiff did not carry her burden of proof on this issue. **Musgrave v. Sullivan**, 966 F.2d 1371, 1376 (10th Cir. 1992). (Plaintiff bears the burden of establishing disability at step three of the sequential evaluation process).

39. An asthmatic claimant may qualify as disabled under 20 C.F.R Pt 404, Subpt. P, App. 1 §303B provided the claimant establishes that she suffers "attacks," in spite of prescribed treatment and requiring physician intervention, occurring at least once every two months or at least six times a year. Each in-patient hospitalization for longer than twenty-four hours for control of asthma counts as two attacks, and an evaluation period of at least twelve consecutive months must be used to determine the frequency of attacks. Attacks are defined as "prolonged symptomatic episodes lasting one or more days and requiring intensive therapy, such as intravenous bronchodilator or antibiotic administration or prolonged inhalation bronchodilator therapy in a hospital, emergency room or equivalent setting." 20 C.F.R. Pt. 404, Subpt. P, App. 1 §3.00(C).

40. Plaintiff was seen and evaluated for asthma on numerous occasions, most of which did not require the administration of intensive therapy. The record reflects that during the relevant period, Plaintiff required intensive therapy, consisting of nebulizer treatments on December 29, 1993 (Tr.

251-252), January 4-7, 1994 (Tr. 271-280), February 27, 1994 (Tr. 324-325) and November 20, 1994. (Tr. 296-297).

41.     In order to satisfy a listing, the impairment must meet all the criteria of that listing. ***Sullivan v. Zebley***, 493 U.S. 521, 530 (1990). The determination of whether a claimant's condition meets or equals a listed impairment is based solely on medical findings. ***Kemp v. Bowen***, 816 F.2d 1469, 1473 (10th Cir. 1987). The ALJ stated that he had reviewed Listings Section 3.00, and found that Plaintiff's condition did not meet or equal a listed impairment. He then briefly stated that Plaintiff's asthma had responded to treatment, had been reported as stable, and was reasonably well controlled as an outpatient. (Tr. 15).

42.     I find that the ALJ's rationale is adequate to establish that Plaintiff does not meet the criteria for listing §3.03 because there is no evidence that she has suffered the requisite number of "attacks" of asthma requiring the specified level of intensive therapy.

### B.     The ALJ erred in assessing Plaintiff's Credibility.

43.     Credibility determinations are peculiarly the province of the finder of fact, and will not be overturned when supported by substantial evidence. ***Diaz v. Sec. of Health & Hum. Serv.***, 898 F.2d 774, 777 (10th Cir. 1990). "However, `[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'" ***Huston v. Bowen***, 838 F.2d 1125, 1131, 1133 (footnote omitted) (10th Cir. 1988), *cited in* ***Kepler v. Chater***, 68 F.3d 387, 391 (10th Cir. 1995).

44.     The ALJ must "articulate specific reasons for questioning the claimant's credibility" where subjective pain testimony is critical. ***Kepler v. Chater***, ***Id***. (internal quotations omitted).

45.     The ALJ stated numerous factors related to his evaluation of Plaintiff's credibility. I will

15

discuss each in turn:

    a. *Plaintiff has not been restricted from performing work-related activities.* (Tr. 15). The record establishes that on two occasions Plaintiff has been given a return to work from an orthopedic physician following work related orthopedic injuries. (Tr. 357, 352). It also establishes that Plaintiff's treating physician agreed that she should work in a pet free environment. (Tr. 373).

    b. *Plaintiff has been advised to stop smoking and to avoid dust, fumes and smoke.* (Tr. 15-16).[13] This finding is supported in the record[14], conflicts with the ALJ's finding that Plaintiff has no work related restrictions, and does not reflect adversely on Plaintiff's credibility. Further, the ALJ failed to discuss whether Plaintiff's past relevant employment exposed her to these environmental limitations, simply concluding that nonexertional factors did not significantly alter her residual functional capacity.

    c. *Plaintiff is active, plays frisbee and goes camping, and she testified that her hobbies were fishing and camping.* The facts set out in the first sentence of the ALJ's finding are supported in the record. (Tr. 320, 99, 323, 400). The second sentence is the

---

[13] Based on this finding, the ALJ concluded that these activities would be difficult for one who has severe restrictions due to pain and an inability to be exposed to dust or other environmental conditions. (Tr. 15). In assessing the existence of substantial evidence, however, the Court is concerned with the findings made by the ALJ, not the conclusions drawn therefrom. ***Huston v. Bowen***, 838 F.2d at 1133 (footnote omitted), cited in ***Kepler v. Chater***, 68 F.3d at 391.

[14] The recommendation was originally made by a medical consultant for the Department of Vocational Rehabilitation on August 19, 1992. (Tr. 225). It was repeated by a non-examining agency physician on February 2, 1993. (Tr. 52). A second non-examining agency physician indicated in September 1994 that Plaintiff should avoid concentrated exposure to "fumes, odors, dusts, gases, poor ventilation, etc." (Tr. 67).

ALJ's conclusion flowing from those facts.

d. *Plaintiff's daily activities include giving speeches and taking receipts for Mothers Against Drunk Drivers. She is able to read from 5-8 hours daily, watch TV for 4 hours daily, fish and camp twice a year, drive, shop for groceries and toiletries twice a month, do laundry and clean house provided she not use chemicals.* (Tr. 16). The record supports this recitation of Plaintiff's activities. (Tr. 95-106).

e. *Plaintiff's asthma has been reported as stable with no shortness of breath, and is reasonably well controlled on an out-patient basis.* (Tr. 15). On August 19, 1992, prior to the relevant period, a physician consultant for the Department of Vocational Rehabilitation stated that Plaintiff's asthma was "reasonably" well controlled on an outpatient basis. (Tr. 225). From February 4, 1993, to the date of the hearing before the ALJ on December 14, 1995, Plaintiff was treated approximately 30 times for asthma and asthma related illnesses such as pleuritis, bronchitis and costrochondritis. On four occasions she required intensive therapy to control her asthma symptoms. (See ¶ 40, supra).

f. *On of January 18, 1995, it was reported that Plaintiff had not been seen in the Pulmonary Clinic for several years.* (Tr. 15). This statement is true as far as it goes, however, it ignores Plaintiff's frequent, consistent treatment for her asthma and related complications at the hospital emergency room and as an outpatient.

g. *As of January 18, 1995, Plaintiff was reported to have chronic inflammation due to tobacco use and association with smokers.* (Tr. 15). This statement is true.

h. *Hospital records from January 4, 1994 through December 21, 1994, do not indicate*

17

*consistent hospital visits for treatment of asthma or aggressive treatment of asthma.* (Tr. 15). This finding can not be supported. First, the ALJ erred by not considering Plaintiff's medical treatment in 1993 and 1995. When the appropriate period is considered, the evidence is overwhelming that Plaintiff was treated consistently, and on occasion aggressively, for asthma.

i. *Plaintiff's complaints of pleuritis are not well documented in the medical file.* (Tr. 14A). This finding can not be supported. Acute pleuritis was diagnosed on at least five occasions, and Plaintiff's chronic chest pain was diagnosed as caused by costochondritis. Further, Dr. Winston specifically stated that Plaintiff's asthma caused severe pleuritic and muscular chest pain from frequent infections and coughing. (Tr. 393). A treating physician's opinion must be given substantial weight unless good cause is shown to disregard it. ***Goatcher v. Dep't of Health & Hum. Serv.***, 52 F.2d 288, 289 (10th Cir. 1995) (citing ***Frey v. Bowen***, 816 F.3d 508, 513 (10th Cir. 1987). The ALJ did not attempt to show good cause for rejecting the opinions of Dr. Winston.

j. *Although Plaintiff complained of migraine headaches, her CAT scan was normal, and her complaints of headache are not well documented in the medical file.* (Tr. 14A). This finding can not be supported. The CAT scan of January 1994 was obtained to rule out causes of headache other than migraine, and indeed, migraine headache was diagnosed. (Tr. 262). The record documents that Plaintiff was seen and treated for headache on several additional occasions.

k. *Plaintiff's medical record demonstrates an increasing usage of prescription pain*

*medications. However, her pain was diffuse and therefor not amenable to treatment with nerve blocks.* (Tr. 14A). These statements are fully supported by the record. However, they in no way reflect adversely on Plaintiff's credibility.

46. I find that the ALJ misconstrued portions of the evidence to such an extent so as to place his entire credibility determination in doubt. An appropriate assessment of Plaintiff's credibility is central to an assessment of Plaintiff's residual functional capacity to return to her past relevant work, or to other work.

## VI. Recommended Disposition

47. For the reasons stated herein, I recommend that Plaintiff's Motion to Reverse be granted in part, and that this matter be remanded to the Commissioner with instruction to

    (1)    Conduct additional proceedings to include reassessment of Plaintiff's credibility.

In addition, although not raised by Plaintiff, I recommend that on remand the Commissioner:

    (2)    Specifically address all three phases of the Step Four sequential analysis, as mandated by *Winfrey v. Chater*, 92 F.3d 1017, 1023-1026 (10th Cir. 1996), and

    (3)    Develop the record further with regard to Plaintiff's diagnoses of autoimmune dysfunction and hepatic disease.

    (4)    Specifically address the side effects, if any, caused by Plaintiff's medications.

 

RICHARD L. PUGLISI
UNITED STATES MAGISTRATE JUDGE